# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

————

Argued April 10, 2006         Decided June 23, 2006

No. 04-1227

NIAGARA MOHAWK POWER CORPORATION,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

RELIANT ENERGY, INC., ET AL.,
INTERVENORS

————

Consolidated with
04-1229, 05-1033, 05-1043, 05-1044,
05-1046, 05-1047, 05-1144

————

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

————

*Elias G. Farrah* argued the cause for petitioners and intervenors in support of petitioners. With him on the briefs were *Michael F. McBride*, *Rebecca J. Michael*, *Kenneth Jaffe*, *Donald J. Stauber*, *Jennifer L. Key*, *Donald K. Dankner*, and

*Raymond B. Wuslich*. *Robert V. Zener* and *Phyllis E. Lemell* entered appearances.

*Diane T. Dean*, Assistant Counsel, Public Service Commission of New York, argued the cause and filed the briefs for petitioner Public Service Commission of New York.

*Robert H. Solomon*, Solicitor, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief was *John S. Moot*, General Counsel.

*Kenneth M. Simon* argued the cause for Competitive Generators in support of respondent. With him on the brief were *Michael J. Rustum*, *Robert C. Fallon*, *Deborah A. Carpentier*, *David E. Blabey*, *Edgar K. Byham*, *David Blake Johnson*, *Steven L. Miller*, *Steven A. Weiler*, *Kenneth Richard Carretta*, *Randolph Q. McManus*, and *Betsy R. Carr*. *Melissa E. Maxwell* entered an appearance.

*Arnold H. Quint* was on the brief for intervenor New York Independent System Operator, Inc.

Before: GRIFFITH, *Circuit Judge*, and EDWARDS and SILBERMAN, *Senior Circuit Judge*s.

Opinion for the Court filed by *Senior Circuit Judge* SILBERMAN.

SILBERMAN, *Senior Circuit Judge*: New York electric power utilities and the New York State Public Service Commission petition for review of FERC orders approving and enforcing a tariff filed by the New York Independent System Operator (NYISO), the manager of New York's electric power transmission facilities. The tariff allows electricity generators that provide power to the transmission grid to avoid

transmission and local distribution charges for the power these generators take from the grid for such purposes as heating, air conditioning, lighting, and powering office equipment (called "station power"), so long as the power the generators produce in any month exceeds the power taken. Petitioners assert, *inter alia*, that FERC's approval of monthly netting for NYISO was unlawful and unreasonable, and that the netting formula imposed in the NYISO tariff should be supplanted with a one-hour netting period. We deny the petition.

I

This case has its genesis in the unbundling of the New York electric energy market. The provision of electric energy to end users traditionally involves three components: electricity generation; high voltage, long-distance power transmission (transmission services); and finally lower voltage, local distribution of electricity from the transmission facilities to end users (distribution services). Prior to 1996, vertically integrated utilities in New York owned facilities covering all three components of this service. Subsequently, however, utilities began divesting their generation facilities, and the vast majority of electricity generation in the state of New York is now performed by independent wholesale generators. While the traditional utilities maintain ownership of the transmission and local distribution facilities, New York state's transmission grid today is operated and controlled by the not-for-profit New York Independent System Operator, or NYISO. Thus, as we understand it, in the typical situation an independent wholesale generator produces the electricity, it is transmitted across the state over NYISO's transmission facilities (or grid), and it is then stepped-down and delivered to a retail user over a utility's local distribution lines.

Jurisdiction over this sale and delivery of electricity is split between the federal government and the states on the basis of the type of service being provided and the nature of the energy sale. Under section 201(b)(1) of the Federal Power Act, 16 U.S.C. § 824(b)(1), FERC has jurisdiction over both the interstate transmission of electricity and the sale of electricity at wholesale in interstate commerce. States retain jurisdiction over retail sales of electricity and over local distribution facilities. Thus transmission occurs pursuant to FERC-approved tariffs; local distribution occurs under rates set by a state's public service commission.

The actual unbundling of the New York electric energy market after 1996 was made possible by FERC's Order 888,[1] which required, among other things, the *functional* unbundling of wholesale generation and transmission services. Under the order, integrated utilities were required to file with FERC open access non-discriminatory transmission tariffs, which applied to both transmission services offered to third-party generators and to the utility's own electricity transmissions. The order also encouraged the creation of independent system operators, such as NYISO, to ensure competitive pricing of transmission services and further reduce utilities' market power.

---

[1]*Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities*, Order No. 888, F.E.R.C. Stats. & Regs. ¶ 31,036, 61 Fed. Reg. 21,540, *clarified*, 76 F.E.R.C. ¶ 61,009, and 76 F.E.R.C. ¶ 61,347 (1996), *on reh'g*, Order No. 888-A, F.E.R.C. Stats. & Regs. ¶ 31,048, 62 Fed. Reg. 12,274, *clarified*, 79 F.E.R.C. ¶ 61,182, *on reh'g*, Order No. 888-B, 81 F.E.R.C. ¶ 61,248, 62 Fed. Reg. 64,688 (1997), *on reh'g*, Order No. 888-C, 82 F.E.R.C. ¶ 61,046 (1998), *aff'd sub nom. Transmission Access Policy Study Group v. FERC*, 225 F.3d 667 (D.C. Cir. 2000), *aff'd sub nom. New York v. FERC*, 535 U.S. 1 (2002).

In addition to addressing open access, Order 888 reaffirmed states' jurisdiction over local distribution services. Order 888 stated that even when FERC's test for identifying local distribution facilities concluded that no such facilities were utilized in a given transaction, states still had authority over the *service* of delivering electric energy to end users. This determination was crucial, as it directly affected utilities' ability to assess end users for "stranded costs." These are costs, such as those associated with long-term contractual commitments or large capital expenditures, that utilities had incurred with the expectation that the industry would remain bundled and that have now become "stranded" with the utilities. By establishing that states have jurisdiction over local delivery *services* and not just local distribution *facilities*, Order 888 allows utilities to assess stranded costs on all retail users. This prevents large industrial customers, for example, from avoiding stranded costs assessments by connecting their plants directly to transmission facilities and stepping down the voltage of the power themselves. *See, e.g.*, *Detroit Edison Co. v. FERC*, 334 F.3d 48, 51 (D.C. Cir. 2003). Order 888 therefore allows states to "assign stranded costs and benefits based on usage (kWh), demand (kW), or any combination or method they find appropriate."

With this statutory and regulatory background in mind, we turn to the subject matter of this consolidated petition – the treatment of station power in New York. FERC describes station power as the electricity used at a generating facility's site to power things such as heating, air conditioning, lighting, and office equipment. When a generator is operational, it might well be capable of redirecting some of its outbound generated electricity to its station power needs, thus "self-supplying" its station power "behind the meter." Certain generators, however, are physically incapable of supplying their station power behind the meter – for example, if produced power goes out to the grid

on one set of power lines, and the facility's offices and electrical equipment are connected to a separate set of lines coming in from the grid. And even for those capable of self-supplying behind the meter, there may be periods when a generator is non-operational or only partially operational and thus incapable of meeting its station power demand. In such instances, generators – who at least in this case, as we understand it, are connected directly to transmission facilities – must look to the grid for their station power supply.

In a series of orders that preceded those here on review, FERC addressed the treatment of station power in the Pennsylvania-New Jersey-Maryland (PJM) electricity market.[2] The independent operator of that system's grid filed with FERC an amendment to its open-access transmission tariff proposing that generators be able to net, on an hourly basis, the station power pulled off the grid as "negative generation" against energy supplied to the grid during that hour. So a generator that pulled station power off the grid for fifty minutes of an hour, for example, but then supplied well in excess of that amount during the final ten minutes, would be deemed to have supplied the netted amount to the grid and consumed nothing. Over objections that the provision of station power to a generator constituted *retail sales* outside FERC's jurisdiction, FERC approved the hourly netting and held that when a generator is net positive over the period, no sale has taken place.

FERC also acknowledged that a generator could engage in "remote self-supply" if its station power requirements over the netting period exceeded its gross output, but there was another

_____

[2]*See PJM Interconnection, LLC*, 93 F.E.R.C. ¶ 61,061 (2000); *PJM Interconnection, LLC*, 94 F.E.R.C. ¶ 61,251, *reh'g denied*, 95 F.E.R.C. ¶ 61,333 (2001); *PJM Interconnection, LLC*, 95 F.E.R.C. ¶ 61,470 (2001).

off-site generator owned by the same entity that was producing sufficient excess electricity over that period to make up for the deficit. According to FERC, in such a case there likewise would be no "sale." But if a generator's station power requirements over the netting period exceeded its gross output, *and* the source of the power was a third party (i.e., there was no remote facility with sufficient excess supply), such a provision of station power would in fact be a sale for end-use outside FERC's jurisdiction. It would be a retail sale subject to both retail transmission rates and state-jurisdictional local distribution charges.

Among FERC's reasons for approving station power netting was that it would ensure that wholesale generators "do not bear a cost that has no relationship to any 'service' purportedly being provided by another party." Netting would therefore further reduce the disparities between wholesale generators and vertically-integrated utilities. FERC added that it would look favorably upon the use of a longer netting period, such as a day or a week; indeed in a fourth *PJM* order, FERC accepted a modification of the station power tariff that changed the netting period from one hour to one month.

Not long after the final FERC order in the PJM matter, New York wholesale generator KeySpan-Ravenswood filed a complaint with FERC challenging NYISO's treatment of station power. On the basis of the *PJM* orders, KeySpan alleged that NYISO's treatment of station power was unjust and unreasonable because it left the matter to the "vagaries of local utilities." FERC agreed and directed NYISO to file a proposed revised tariff covering the provision of station power and allowing self-supplying wholesale generators to net station power over some reasonable period. FERC explained, however, that it was not necessary for NYISO's proposal to incorporate

aspects of the PJM tariff that would be inappropriate for New York.[3]

## II

The four pairs of orders under review are follow-ons to the initial *KeySpan-Ravenswood* proceedings.[4] In a tariff approved by FERC in the first pair of these orders, NYISO determined that the appropriate station power netting period for New York was one month.[5] The utilities challenged that proposed tariff on a number of grounds, which they reiterate before us. It is their contention that monthly netting violates the Federal Power Act

---

[3]*See KeySpan-Ravenswood, Inc. v. New York Indep. Sys. Operator, Inc.*, 99 F.E.R.C. ¶ 61,167 (*KeySpan I*), *on reh'g*, 100 F.E.R.C. ¶ 61,201 (2002) (*KeySpan II*).

[4]The four pairs of orders under review are: *KeySpan-Ravenswood, Inc. v. New York Indep. Sys. Operator, Inc.*, 101 F.E.R.C. ¶ 61,230 (2002) (*KeySpan III*), *reh'g denied*, 107 F.E.R.C. ¶ 61,142 (2004) (*KeySpan IV*); *Nine Mile Point Nuclear Station, LLC v. Niagara Mohawk Power Corp.*, 105 F.E.R.C. ¶ 61,336 (2003), *reh'g denied*, 110 F.E.R.C. ¶ 61,033 (2005); *AES Somerset, LLC v. Niagara Mohawk Power Corp.*, 105 F.E.R.C. ¶ 61,337 (2003), *reh'g denied*, 110 F.E.R.C. ¶ 61,032 (2005); *Niagara Mohawk Power Corp. v. Huntley Power LLC*, 109 F.E.R.C. ¶ 61,169 (2004), *reh'g denied*, 111 F.E.R.C. ¶ 61,120 (2005). The latter three pairs of orders involve failed attempts by utility Niagara Mohawk to charge generators for delivery of netted-out station power, contrary to the *KeySpan* orders. In all instances, the generators were not physically connected to Niagara's local distribution facilities.

[5]The record does not indicate why NYISO chose one month over alternative netting periods. NYISO is an independent entity and is governed by a board of directors, none of whom is affiliated with market participants.

because, as a practical matter, it encroaches upon state jurisdiction over local distribution services and retail sales. Although we are not told how much retail sale of station power (and therefore local distribution charges) is left under a monthly netting regime, we are given to understand that it would not be significant. Although FERC has acknowledged jurisdiction over the transmission of power over the grid, according to petitioners the monthly netting policy unlawfully extends federal jurisdiction over local distribution services and retail sales because it allows generators to avoid transmission and local distribution charges altogether.

Petitioners also assert that in the seminal Order 888, in which FERC laid the legal groundwork for the unbundling of the electric power market, FERC explicitly recognized that delivery services to end users remained under state jurisdiction and drew no distinction between the typical industrial end user and a power generator taking power from the grid. Assuming *arguendo* that FERC has jurisdiction to approve the tariff, petitioners' remaining significant argument is that the one month netting period is so long as to be unreasonable (arbitrary and capricious).

The Commission responds first by asserting that we lack jurisdiction over petitioners' arguments based on the Act and Order 888 because they did not, in a timely manner, petition for review of the earlier *PJM* orders and *KeySpan I*, in which the netting *principle* was adopted. *See* 16 U.S.C. § 825l(b). Petitioners claim that not all of them were parties to those earlier proceedings, and that in any event they were not aggrieved until FERC approved monthly netting in New York in *KeySpan III* and so had no right to seek review of the earlier orders. It is clear that petitioners were not dissatisfied with the prospect of there being some sort of station power netting in New York; indeed, as we emphasize below, petitioners have no quarrel with

an hourly netting tariff. This, however, does not necessarily mean that they had no standing to challenge the earlier orders.

But even had petitioners all been parties to the earlier proceedings and been aggrieved by the *PJM* orders or *KeySpan I*, they would not have forfeited their right to challenge the principle of netting by not petitioning for review earlier. Even if a party technically can establish standing (aggrievement), it need not seek review if it is satisfied with the practical impact of the order; and that does not foreclose its ability to challenge the principle as beyond the agency's statutory authority when the agency later utilizes it to cause substantial injury.[6] *See Sacramento Mun. Util. Dist. v. FERC*, 428 F.3d 294, 299 (D.C. Cir. 2005) (identifying an objection "to the Commission's . . . statutory authority" as a typical situation in which "agency rules can . . . be challenged on substantive grounds when they are applied, even though the statutory period for judicial review has expired").

## III

Petitioners' statutory argument is not insubstantial; the Commission's jurisdictional rationale is a bit confusing. It

---

[6]Suppose the federal government decided to preempt state regulation of a highway, and the federal agency promulgated a rule reducing the speed limit from the state's seventy miles per hour to sixty-five. While a common carrier utilizing the highway might technically be aggrieved by such a move and even doubt the legality of the exercise of federal power, it might not deem such slight harm worthy of a suit in federal court. Nonetheless, if the federal government later reduced the speed limit to forty-five – now causing significant harm to the carrier – nothing would bar the carrier from then challenging the government's preemption of state authority.

insists that no sale *of any kind* takes place when a generator takes power from the grid for station power service, so long as its netting is positive for the month. So FERC does not appear to rely on its wholesale jurisdiction (although the generator's delivery of power to the grid is a wholesale sale and the deduction made for station power taken is valued at the same wholesale price).[7] To be sure, FERC does have undoubted jurisdiction over interstate transmission (the grid), and the generators at issue in this case take station power directly from the grid. But it has not clearly articulated why that jurisdiction permits it to determine that no sale of any kind – including a retail sale – takes place when the generator takes station power from the grid.

The difficulty we see in petitioners' jurisdictional argument, however, is their clear concession that an hourly netting tariff would not violate the Act – which is a recognition that, in drawing the jurisdictional lines in this area, some practical accommodation is necessary. Thus, utility petitioners argued for hourly netting below, *see, e.g.*, *KeySpan III*, 101 F.E.R.C. at ¶ 62,001, and in its initial brief, petitioner Public Service Commission clarified that it "does not disagree with netting *per se*." Counsel for the utilities reaffirmed this shared sentiment at oral argument. In response to a question from the panel as to whether the utilities had any objection to hourly netting, counsel said, "No, we were, in fact, proposing that [before the Commission]." Counsel elaborated that, "I have to speak for my clients which are the utility petitioners and they have no problem

---

[7]At oral argument, counsel for FERC was asked, "But even if it was a sale it would be a wholesale sale in FERC's jurisdiction?" Counsel replied, "Yes, that is our jurisdictional hook"; but neither in its brief nor in the orders below has FERC asserted that its jurisdiction to order station power netting is founded on its statutory jurisdiction over wholesale sales.

with the hour[ly netting,] but the State, who has the legal authority to regulate that retail sale and determine the measurement period[,] may feel differently." But then counsel for the "state" – the New York Public Service Commission – also conceded that hourly netting would be permissible. Questioned further by the panel, counsel agreed that it would be a valid policy judgment on the part of FERC to determine that no retail sale occurred and that no local distribution service was utilized if a generator was net positive over an hour. According to counsel, the real issue is that "an hour . . . recognizes more reasonably the fluctuations which FERC says in its decisions, it wants to recognize." And "[o]ne month does not recognize fluctuations."

Petitioners object to monthly netting because it eliminates many – perhaps virtually all – of the station power transactions, and a shorter netting period would eliminate fewer. But if we were to accept petitioners' logic, *any* netting out of what it deems "retail sales" over *any* period would amount to a statutory violation. It is possible to measure the power taken from the grid over a shorter period than an hour. Indeed, it apparently could be done in real time. If the Federal Power Act, as petitioners contend, prevents NYISO from exerting authority over state-jurisdictional transactions by netting them out, then any such exertion must be a violation. And, on the other hand, if hourly netting is perfectly consistent with the statute, we see no principled reason why monthly netting violates the Act.

Nor do we see anything in Order 888 that buttresses petitioners' jurisdictional argument. Although the Commission used the term "end users" in that order without qualification – and it might well have been open to FERC to interpret the order as treating generators like typical end users – FERC has made it clear that the Order's purpose was to prevent large industrial and commercial users from avoiding their share of a utility's

stranded costs. Generators who purchased their facilities from utilities, according to FERC, are deemed to have paid a premium to cover some part of these stranded costs, and thus are in a quite different position from a retail user. It is, therefore, certainly a reasonable interpretation of Order 888 to carve out an exception from the term "end user" for wholesale generators. Petitioners would hang their hat on Order 888's recognition that an end user takes local distribution *service* even if, in fact, it does not physically use a utility's local distribution facilities – which is really a fiction, if a reasonable one[8] – but FERC is not required to extend this fiction to the new creature in the market, the wholesale generator.

In any event, petitioners' concession equally undermines their argument based on Order 888. If generators must be thought of as equivalent to industrial end users, then hourly netting would be equally illegitimate; and if not, we do not see how the language of that order would permit netting over one hour but not one month.

IV

Petitioners' argument, based on the APA – that the Commission's approval of monthly netting is unreasonable – is, of course, not affected by their concession. But it will be recalled that FERC did not mandate a one month netting period; it only approved NYISO's choice. And it had cautioned that its approval of an hourly netting tariff in the adjacent Pennsylvania-

---

[8] Paradoxically, FERC's reasoning that the generators should not have to pay for local distribution services they do not take is exactly what it rejected in Order 888 when presented with industrial users who wished to bypass the local utilities' distribution facilities and connect directly to transmission lines.

New Jersey-Maryland market did not establish a required approach. Indeed, as we noted, FERC subsequently approved a modification to that tariff providing for monthly netting. FERC observed, in later approving the NYISO tariff, that a monthly netting period in New York would have the benefit of creating uniformity with the adjacent PJM energy market to the south. Petitioners respond that the New England market operates with hourly netting, but that does not rebut FERC's position that both might be reasonable.

As should be apparent, the monthly netting tariff will result in less revenue – a good deal less, according to petitioners – flowing from the generators to the utilities. FERC's concern seems to be only that some version of netting is necessary in order to put wholesale generators in roughly the competitive position integrated utilities enjoy and that monthly netting presumably puts the generator closer to a competitor who might never need to take power from the grid. Petitioners claim that this competitive concern is really irrelevant in the New York market because there are few integrated utilities left. FERC responds that there are some remaining and that other utilities purchase power for resale and are, therefore, continuing to compete with wholesale generators. Of course, the New York wholesale generators are also competing with generators and integrated utilities in the PJM market. In sum, we simply do not see, on these arguments, how we could determine that a one-hour, a one-month, or for that matter a one-week netting period is unreasonable.

The strongest point petitioners make is that one month is inconsistent with the hourly method by which actual power, as opposed to transmission costs, is priced. Pricing of electricity in New York is performed on an hourly basis. Any time a generator pulls electricity off the grid, that withdrawal is accounted for at what is called a locational-based marginal price

(LBMP). Injections of electricity into the grid by generators are likewise accounted for at the appropriate LBMP. Thus even if a wholesale generator has positive net output over the month and is treated as having made no "purchase" of station power over that period – and thus treated as having used no transmission or local delivery facilities in connection with that netted out station power – the wholesale generator still is held accountable for the actual electricity consumed. This, according to petitioners, is an indication that the parties recognize that a sale took place (and, according to petitioners, a retail sale), and so for transmission and distribution purposes hourly netting is similarly required. But FERC reasonably regards that hourly charge as an accounting entry rather than an actual sale of power, and it does not follow that hourly netting of power necessarily dictates hourly netting for transmission and distribution costs. As FERC also notes, NYISO's billing and accounting practices are *month*-based.

\* \* \*

Accordingly, for the reasons stated, we deny the petition.[9]

---

[9]Petitioners make a series of additional arguments, which we need only mention briefly. They argue that the FERC orders violate both the filed rate doctrine and the rule against retroactive ratemaking. The "filed rate," petitioners contend, is Part IV of the NYISO tariff, which applies to retail service. This is but a variation on petitioners' other arguments, as it relies on the proposition that the provision of station power service within the netting period is a state-jurisdictional retail sale. As explained above, this argument cannot withstand petitioners' concession that hourly netting is appropriate. Petitioners also argue that the *Huntley* and *AES Somerset* orders violate the rule against retroactive ratemaking because they allow the generators to net station power beginning in July 1999, well before the April 1, 2003 effective date of the NYISO station power netting tariff. But without there

having been a preexisting relevant filed rate, there can be no retroactive alteration of it. *See Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 578 (1981).

The Public Service Commission argues that FERC's orders have the effect of discriminating against cogeneration facilities, who do not have the benefit of netting station power; but this argument is foreclosed because it was not raised below. *See* 16 U.S.C. § 825l(b). Finally, utility petitioners argue that the station power tariff violates NYISO's governance structure because NYISO's management committee did not approve the tariff filing. We find this argument meritless since NYISO was *required* to make such a filing to comply with the Commission's order in *KeySpan I*.