Opinions of the Colorado Supreme Court are available to the public and can be accessed through the Judicial Branch's homepage at http://www.courts.state.co.us. Opinions are also posted on the Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE

**2021 CO 36**

**No. 20SA103, *San Isabel Electric v. Public Utilities Commission*—Public Utility Law—Station Power—Vertically Integrated Utility**

The supreme court addresses whether a rural cooperative electric association's certificates of public convenience and necessity ("CPCNs")—which grant the association the exclusive right to provide electric service in its certificated area—encompass the right to provide station power to the electric generation facilities of a vertically integrated utility capable of self-supplying such power. The court holds that the PUC regularly pursued its authority in concluding that the association does not have such a right under its CPCNs and that the vertically integrated utility may self-supply station power using its own electric generation resources. The court further holds that, because the association had no property right to supply station power to the vertically integrated utility, the PUC's decision did not amount to a taking of property without due process. The court thus affirms the judgment of the district court upholding the PUC's ruling.

# The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

## 2021 CO 36

### Supreme Court Case No. 20SA103
*Appeal from the District Court*
District Court, City and County of Denver, Case No. 19CV31602
Honorable Eric M. Johnson, Judge

### Petitioner-Appellant:

San Isabel Electric Association, Inc.,

v.

### Respondents-Appellees:

The Public Utilities Commission of the State of Colorado; Jeffrey Ackermann, in his official capacity as Chairman of the Public Utilities Commission of the State of Colorado; Frances A. Koncilja, in her official capacity as a member of the Public Utilities Commission of the State of Colorado; John Gavan, in his official capacity as a member of the Public Utilities Commission of the State of Colorado; Black Hills Colorado Electric, LLC; and Black Hills Colorado Wind, LLC.

### Judgment Affirmed
*en banc*
June 1, 2021

**Attorney for Petitioner-Appellant:**
Sisto Mazza
*Trinidad, Colorado*

**Attorneys for Respondents-Appellees Public Utilities Commission of the State of Colorado, Jeffrey Ackermann, Frances A. Koncilja, and John Gavan:**
Philip J. Weiser, Attorney General
Paul C. Gomez, First Assistant Attorney General
Ruth M. Harper, Assistant Attorney General
    *Denver, Colorado*

**Attorneys for Respondents-Appellees Black Hills Colorado Electric, LLC; and Black Hills Colorado Wind, LLC:**
Wilkinson Barker Knauer, LLP
Raymond L. Gifford
Caitlin M. Shields
Ethan D. Jeans
    *Denver, Colorado*

Black Hills Corporation
Tyler E. Mansholt
    *Denver, Colorado*

**JUSTICE MÁRQUEZ** delivered the Opinion of the Court.

¶1     Appellant San Isabel Electric Association, Inc. is a rural cooperative electric association that holds two certificates of public convenience and necessity ("CPCNs") issued by the Colorado Public Utilities Commission ("PUC"). Under its CPCNs, San Isabel has the exclusive right to provide electric service as a public utility to members and non-member customers in its certificated area, which spans seven counties in southern Colorado. The question before us is whether San Isabel's CPCNs include the right to provide station power to two wind farms located in San Isabel's certificated territory that are owned by another utility, Black Hills Colorado Electric, LLC and Black Hills Colorado Wind, LLC (collectively, "Black Hills"). The PUC concluded that San Isabel's CPCNs do not include the right to provide station power to operate the wind turbines' electronics, hydraulic pumps, heaters, and other auxiliary equipment at Black Hills' wind farms, and that the decision to allow Black Hills to self-supply station power to its wind farms did not violate San Isabel's state and federal constitutional rights to due process. The district court affirmed the PUC's ruling.

¶2     We now affirm the judgment of the district court. We hold that, on the facts of this case, the PUC regularly pursued its authority in concluding that San Isabel's right under its CPCNs does not include the right to provide station power to Black Hills' generation facilities and that Black Hills, as a vertically integrated utility, may self-supply such power using its own interconnected transmission network

3

and electric generation resources. We further hold that, because San Isabel did not have a property right to supply station power to another utility, the PUC's decision did not amount to a taking of property without due process.

## I. Facts and Procedural History

### A. Background

¶3 Section 40-9.5-105(1), C.R.S. (2020), allows the PUC to issue a CPCN assigning specific service territories to a cooperative electric association. An electric utility that has been granted a CPCN generally has the exclusive right to provide electricity in its certificated territory. *Pub. Utils. Comm'n v. Home Light & Power Co.*, 428 P.2d 928, 936 (Colo. 1967) ("[O]nce an area has been [c]ertificated to [a] utility, it and it alone has the right to serve the future needs of that area provided it can do so."). The key issue in this case is whether such a right includes the provision of "station power," a term understood in the industry as the electric energy required to operate and maintain electric generation facilities. *See, e.g.*, *PJM Interconnection, LLC*, 94 FERC ¶ 61,251, at 61,889 (2001) ("*PJM II*")[1] (Federal Energy Regulatory Commission defining "station power" as the electric energy used for,

---

[1] *PJM II* was the second in a series of orders issued by the Federal Energy Regulatory Commission addressing the treatment of station power in the Pennsylvania-New Jersey-Maryland ("PJM") electricity market. *See PJM Interconnection, LLC*, 95 FERC ¶ 61,470 (2001) ("*PJM III*"); *PJM Interconnection, LLC*, 93 FERC ¶ 61,061 (2000) ("*PJM I*").

4

*inter alia*, "operating the electric equipment that is on the generating facility's site").

¶4     An electric generation facility can procure station power through one of three means: (1) on-site self-supply (i.e., by redirecting electricity generated on site for internal use); (2) remote self-supply (i.e., by obtaining power from an off-site generator owned by the same company); or (3) third-party supply (i.e., by drawing power through the grid from an unaffiliated provider). *See Calpine Corp. v. FERC*, 702 F.3d 41, 42 (D.C. Cir. 2012); *PJM II*, at 61,890.

¶5     Historically, electric utilities were vertically integrated, meaning they owned all three aspects of electric service—electricity generation, long-distance power transmission, and local distribution of electricity to end users—and sold these services as bundled packages in their service areas. *Calpine*, 702 F.3d at 42. These vertically integrated utilities did not charge themselves for the use of station power at their generating facilities but instead subtracted ("netted") the energy consumed as station power from their gross output of electric energy. *Id.* at 43. In other words, whether through on-site or remote self-supply, a vertically integrated utility used only its own generating resources for station power and accounted for such usage through the practice of netting. In so doing, the energy industry has traditionally treated station power as distinct from other types of electric service.

5

¶6    In 1996, however, the Federal Energy Regulatory Commission ("FERC")

issued Order 888, which unbundled electricity generation from transmission and

distribution services. *Calpine*, 702 F.3d at 43; *Niagara Mohawk Power Corp. v. FERC*,

452 F.3d 822, 824 (D.C. Cir. 2006). Order 888 successfully encouraged the creation

of independent wholesale generators, but it raised questions about how

independent generators would be charged for their use of station power when the

source of that station power is a third party. *Calpine*, 702 F.3d at 43; *PJM II*, at

61,882. A series of FERC decisions, *see PJM Interconnection, LLC*, 93 FERC ¶ 61,061,

at 61,163 (2000) ("*PJM I*"); *PJM II*, at 61,890; *PJM Interconnection, LLC*, 95 FERC

¶ 61,470, at 62,187 (2001) ("*PJM III*"), addressed this question by devising "netting

intervals," reasoning that if a generator uses more power than it sends over a fixed

period, it is deemed to have obtained the shortfall in a retail sale from a third party.

*Calpine*, 702 F.3d at 43. Those decisions also gave rise to jurisdictional issues

between federal authorities (which regulate wholesale sales and transmission of

electric energy in interstate commerce), *see* 16 U.S.C. § 824(b)(1) (2018), and state

authorities (which regulate other sales and local distribution of electricity), *see id.*

As relevant here, those decisions made clear that a generator's self-supply of

station power does not involve a sale at all (wholesale or retail). *See, e.g.*, *PJM II*,

at 61,890 (reasoning that "[f]or both on-site self-supply and remote self-supply," a

generator uses "only its own generating resources" and "is not consuming another

6

party's energy," meaning "there is no sale (for end use or otherwise) between two different parties, but only one party using its own generating resources for the purposes of self-supply and accounting for such usage through the practice of netting"); *see also Niagara Mohawk*, 452 F.3d at 826.

## B. Facts

¶7    Appellant San Isabel is a rural, nonprofit, cooperative electric association regulated by the PUC under section 40-9.5-101, C.R.S. (2020).[2] On January 13, 1958, the PUC granted San Isabel a CPCN through Decision No. 49302. The 1958 CPCN furnished San Isabel with the exclusive right to provide electric service "for light, heat, power, and other purposes" in Huerfano, Las Animas, Pueblo, Freemont, and Custer Counties. San Isabel also holds a CPCN granted on December 9, 1970, in Decision No. 76421, which expanded its service territory and authorized it to provide electric service in designated areas of Pueblo County. The 1970 CPCN provided that "[n]othing contained herein shall be interpreted to preclude a utility from traversing an area certificated to another utility with transmission or

---

[2] In accordance with section 40-9.5-103, C.R.S. (2020), San Isabel's members have voted to exempt San Isabel from PUC regulation under articles 1 through 7 of title 40, C.R.S. San Isabel is instead regulated by the PUC under sections 40-9.5-105 to -107, C.R.S. (2020). Under those provisions, the PUC retains authority over San Isabel's right to serve as well as complaints about rates and other matters.

distribution feeder lines or from locating substations or other needed facilities therein."

¶8 Black Hills is a vertically integrated, for-profit public electric utility governed by the Public Utilities Law, sections 40-1-101 to 40-7-118, C.R.S. (2020). It is engaged in the generation, transmission, distribution, and purchase of electricity in service territories within Colorado for which it holds CPCNs or territorial grandfather rights.

¶9 Black Hills owns and operates two wind-powered electric generation facilities ("Wind Facilities") located in San Isabel's certificated territory under the 1958 CPCN. The first is Busch Ranch, a 29.04-megawatt facility located in Huerfano County. In 2011, the PUC granted a CPCN to Black Hills to develop, construct, and own fifty percent of the wind turbines and other facilities at Busch Ranch.[3] Busch Ranch became operational in October 2012. The second is Peak View, a 60-megawatt facility that is located in Huerfano and Las Animas Counties. In 2015, the PUC granted a CPCN to Black Hills to purchase and own Peak View.

---

[3] When San Isabel initiated the action, Black Hills jointly owned the Busch Ranch facility with AltaGas Renewable Energy Colorado LLC, each having a fifty percent undivided interest. Black Hills purchased AltaGas, which thus became Black Hills Colorado Wind, LLC, an indirect subsidiary and non-regulated affiliate of Black Hills. Black Hills now owns AltaGas and its fifty percent, undivided interest in Busch Ranch.

8

Peak View became operational in November 2016. Both facilities are renewable energy resources.

¶10 To obtain electricity generated by the Wind Facilities for its own certificated territory, Black Hills applied for permission to construct and operate the Rattlesnake Butte Project, which included a 36-mile long, 115-kilovolt transmission line and substation located within San Isabel's certificated territory in Huerfano County. The transmission line and substation are designed to accommodate two-way power flows out of and into the Wind Facilities.

¶11 The PUC approved the Rattlesnake Butte Project without requiring a CPCN, deeming it to be within the ordinary course of business pursuant to section 40-5-101, C.R.S. (2020) (specifying that a public utility need not secure a CPCN when an extension to territory already served is necessary in the ordinary course of business). At the time, San Isabel did not object to, or comment upon, the proposed construction of the transmission line and substation.

¶12 The Wind Facilities require station power to operate and maintain the electric equipment on site. When the wind is blowing sufficiently, the Wind Facilities generate and self-supply the station power required to operate. However, during periods when the Wind Facilities do not generate and self-supply station power, the necessary station power must be supplied from another source to prevent damage to the wind turbines. As a vertically integrated utility,

Black Hills has no need to acquire station power from a third party. Instead, Black Hills remotely self-supplies the station power to the Wind Facilities by back-feeding electricity through the Rattlesnake Butte lines. Black Hills then nets the back-fed station power used by the Wind Facilities against the total output of electricity to calculate the total generation output. The average amount of power back-fed by Black Hills to its Wind Facilities in 2017 comprised 0.26% of the total generation output of the two Wind Facilities combined.

## C. Procedural History

¶13    On January 26, 2018, San Isabel filed with the PUC a complaint and petition for declaratory relief against Black Hills and AltaGas, claiming that Black Hills' self-supply of station power to the Wind Facilities violated San Isabel's right to provide electric service in its certified territory. The complaint requested a declaration that only San Isabel is authorized to provide electric service to the Wind Facilities.

¶14    On March 5, 2018, Black Hills responded by filing its own petition requesting declarations that its provision of station power to the Wind Facilities (1) is not a retail sale of electricity subject to PUC regulation under Colorado law and (2) did not violate San Isabel's right to serve under its CPCN. Black Hills moved to stay San Isabel's complaint pending resolution of its own petition, or in the alternative, to consolidate the two proceedings.

10

¶15 The PUC referred both matters to an administrative law judge ("ALJ") and consolidated them. Without holding a hearing, the ALJ issued Recommended Decision No. R18-1126 on December 13, 2018, dismissing San Isabel's complaint and petition for declaratory relief and granting, in part, Black Hills' petition for declaratory ruling. Specifically, the ALJ determined that (1) the PUC has jurisdiction to regulate the supply of station power to the Wind Facilities; (2) Black Hills' self-supply of station power to the Wind Facilities (whether on-site or remotely from off-site generation and transmission facilities) is not a sale of electricity for end use or a retail sale; (3) San Isabel does not have any right to provide station power to the Wind Facilities under its CPCN; and (4) Black Hills has not violated San Isabel's right to provide electric service under its CPCN and, therefore, may continue to self-supply its station power.

¶16 On January 25, 2019, San Isabel filed exceptions to the ALJ's Recommended Decision, asserting that the ALJ effectively removed portions of its service territory without complying with the procedures required by section 40-9.5-105(3) (requiring the PUC to determine, after a hearing upon complaint, that an electric public utility is "unwilling or unable to serve an existing or newly developing load within its certificated territory and that the public convenience and necessity requires a change" before deleting certificated territory from a CPCN), and thus

11

violated San Isabel's right to due process. On March 28, 2019, the PUC issued a decision denying the exceptions and adopting the ALJ's Recommended Decision.

¶17 On April 25, 2019, San Isabel sought judicial review in the Denver District Court, arguing that the PUC failed to regularly pursue its authority by (1) acting in excess of its authority, (2) failing to apply the proper legal standards, (3) applying an arbitrary and capricious standard, and (4) depriving it of its property without due process of law. The district court affirmed the PUC decision on February 3, 2020, rejecting all of San Isabel's legal challenges. San Isabel then brought an appeal to this court pursuant to section 40-6-115(5), C.R.S. (2020).

## II. Analysis

¶18 The core question before us is whether San Isabel's exclusive right to "render electric service" under its CPCNs includes the right to provide station power to another utility's generation facilities within its certificated territory. San Isabel argues that it does, and that the PUC failed to regularly pursue its authority when it concluded otherwise. Specifically, San Isabel contends that the PUC's conclusion that San Isabel's CPCNs do not include the right to serve Black Hills' Wind Facilities is inconsistent with the principle of regulated monopoly; that its decision to distinguish station power from other types of electric service was arbitrary and capricious; and that the PUC failed to comply with section 40-9.5-105(3) and applicable case law, which required the PUC to find that

12

San Isabel was "unwilling or unable to serve" the Wind Facilities before reducing San Isabel's certificated service territory. San Isabel further contends that the PUC deprived it of state and federal constitutional due process by taking away its exclusive right to provide electric service without holding a hearing or applying the legal standard under section 40-9.5-105(3).

¶19 Black Hills and the PUC respond that San Isabel's exclusive rights under its CPCNs do not include the provision of station power to another utility's facilities because station power is treated differently from other electric service in the utilities industry. Instead, they argue, when a generator self-supplies its own energy (either on-site or through remote self-supply), it is not consuming another party's electricity. Under such circumstances, there is no sale of electricity between two parties; rather, one party is using its own generating resources and accounting for such usage through the practice of netting. Consequently, as a vertically integrated utility, Black Hills may self-supply station power to its own wind facilities using its interconnected transmission network and electric generation resources without violating San Isabel's CPCN rights. Respondents further argue that the PUC interpreted the scope of the rights granted in the CPCNs without "reducing" those rights, and thus had no duty to apply the "unwilling or unable to serve" standard in section 40-9.5-105(3). Finally, Respondents assert that, because the PUC appropriately found that San Isabel had

no existing property right to supply station power, San Isabel was not deprived of due process.

¶20 We agree with Respondents. We hold that the PUC regularly pursued its authority and applied proper standards in determining that the utility industry has traditionally distinguished station power from traditional retail electric service and that, when a vertically integrated utility like Black Hills self-supplies station power from its own generation resources, there is no sale of electricity. Thus, San Isabel's exclusive right under its CPCN to provide electric service does not include the right to provide station power to Black Hills' Wind Facilities located within San Isabel's certificated territory. Moreover, because San Isabel had no property right in providing station power to the Wind Facilities, the PUC's decision did not violate San Isabel's due process rights under the Colorado or U.S. Constitutions. We therefore affirm the judgment of the district court upholding the PUC's decision.

## A. Standard of Review

¶21 The PUC derives broad power from the Colorado Constitution "to regulate the facilities, service and rates and charges therefor" of public utilities in Colorado. Colo. Const. art. XXV. The General Assembly has granted the PUC authority "to do all things, whether specifically designated in articles 1 to 7 of this title or in

14

addition thereto, which are necessary or convenient in the exercise of such power."

§ 40-3-102, C.R.S. (2020).

¶22 Because the PUC "is an administrative agency with considerable expertise in the area of utility regulation . . . , its decisions should be accorded due deference." *Integrated Network Servs., Inc. v. Pub. Utils. Comm'n*, 875 P.2d 1373, 1377 (Colo. 1944). Specifically, "we give deference to PUC interpretations of applicable statutes and regulations," though "its interpretations of law do not control [our] conclusion of law." *Pub. Serv. Co. v. Trigen-Nations Energy Co., L.L.L.P.*, 982 P.2d 316, 322 (Colo. 1999). Where the PUC interprets its own certificates, the PUC is of course the proper authority to do so. *Pub. Utils. Comm'n v. Grand Valley Rural Power Lines, Inc.*, 447 P.2d 27, 28 (Colo. 1968); *see also McKenna v. Nigro*, 372 P.2d 744, 746 (Colo. 1962) ("Certainly the Commission as the immediate authority issuing the certificate is in the best position to know what rights were intended to be granted thereunder."). Thus, we interfere only when the PUC's interpretation of a certificate is "clearly erroneous, arbitrary or in excess of its jurisdiction." *McKenna*, 372 P.2d at 745.

¶23 Where, as here, the validity of a decision is challenged on the ground that it violates the petitioner's constitutional rights, this court exercises independent judgment on the law but affords deference to the PUC's factfinding and policymaking roles. *Trigen-Nations*, 982 P.2d at 322. Such review is limited to

determining whether (1) the commission has regularly pursued its authority, (2) the decision of the commission is just and reasonable, and (3) its conclusions are in accordance with the evidence. *Id.*; *see also* § 40-6-115(2)–(3). Here, San Isabel challenges the PUC's decision only under the first consideration—whether the PUC regularly pursued its authority.

¶24 The PUC has regularly pursued its authority when its "findings of fact and conclusions were based upon adequate evidence, and . . . the commission reached its decision by applying the appropriate constitutional and legislative standards." *Durango Transp., Inc. v. Colo. Pub. Utils. Comm'n*, 122 P.3d 244, 248–49 (Colo. 2005) (quoting *Atchison, Topeka & Santa Fe Ry. Co. v. Pub. Utils. Comm'n*, 572 P.2d 138, 141 (Colo. 1977)). Such "evidence must be viewed in the light most favorable to the PUC's decision." *Trans Shuttle, Inc. v. Pub. Utils. Comm'n*, 89 P.3d 398, 403 (Colo. 2004).

## B. The PUC Regularly Pursued Its Authority

¶25 We determine that the PUC had an adequate basis for concluding that station power should be treated distinctly from other electric services and thus that San Isabel's exclusive right to render electric service in its certificated territory does not include the provision of station power to vertically integrated utilities.

16

## 1. Provision of Station Power Is Treated Differently in the Utility Industry and Involves No Sale When Self-Supplied

¶26  There is no debate that station power is electric energy. Both the FERC and the PUC define station power as "the electric energy used for the heating, lighting, air-conditioning, and office equipment needs of the buildings on a generating facility's site, and for operating the electric equipment that is on the generating facility's site." *PJM II* at 61,889; *Cogentrix of Alamosa, LLC v. San Luis Valley Rural Elec. Coop.*, Case No. 14D-1013E, Decision No. CI5-0307-1, ¶ 4, 2015 WL 1675779, at *2 (Colo. P.U.C. 2015).

¶27  However, the utility industry has traditionally distinguished station power from other types of electricity. Station power is necessary to avoid damage to the generation facilities of a utility. As the Minnesota PUC explains, "unlike traditional retail [electric] service, [station power] is not being provided to a household, institution, or business for ultimate consumption apart from the production of electricity. Instead, the service is being provided to a generating facility to prevent damage to the facility." *In the Matter of the Complaint of Nobles Coop. Elec. for a Serv. Territory Violation by Mo. River Energy Servs. & Worthington Pub. Utils.*, Docket No. ET-10, E-126, E-332/C-02-1501 at 11, 2003 WL 1957117, at *8 (Minn. P.U.C. 2003). Thus, even when it is provided by third parties, the "service is unique, clearly defined, and non-transferrable. It is limited in scope to the amount of power necessary to prevent damage to the turbine systems when

17

self-generation is impossible." *Id*. at *9. Accordingly, station power is distinguished as an "internal cost" that is "necessary to operate the facility and enable it to generate electricity." *See PJM II,* at 61,891 (quoting *Penntech Papers, Inc.,* 48 FERC ¶ 61,120, at 61,423 (1989)).

¶28 Historically, vertically integrated utilities—like Black Hills—have netted the energy consumed as station power against their gross energy output instead of charging themselves for it. *Calpine*, 702 F.3d at 43; *PJM II,* at 61,889; *see also Cal. Indep. Sys. Operator Corp.,* 111 FERC ¶ 61,452, at 62,995 n.11 (2005) (reviewing *PJM II* and finding no evidence that the traditional accounting treatment of station power differed in the West). Thus, by netting station power against the gross energy output, the energy industry has treated station power as distinct from other types of electric service. *See PJM II*, at 61,889–90. In other words, by their use of station power to produce a net energy output to the electrical grid, electric generation facilities like the Wind Facilities here are distinguishable from other "consumers" of electricity.

¶29 Many jurisdictions have codified the distinct treatment of station power in statutes and regulations. *See, e.g.,* Kan. Stat. Ann. § 66-1,173(b) (2021) ("[S]tation power shall not be deemed to be retail electric service for the purposes of this act."); Wis. Stat. § 196.495(3) (2021) ("Nothing in this section shall preclude any public utility . . . from extending electric service to its own property or

18

facilities . . . ."); Minn. Stat. § 216B.42, subdiv. 2 (2021) ("Notwithstanding the provisions in section 216B.39, any electric utility may extend electric lines for electric service to its own utility property and facilities."); Or. Admin. R. 330-160-0015(22) (2021) (separately defining "station service" as the energy used to operate an electric or thermal generating plant).

¶30 Although Colorado has not similarly codified the distinct treatment of station power, the PUC indicated fifteen years ago that it would not prohibit a utility from self-supplying station power to its generation facilities even when located in another utility's territory. *See Aquila, Inc. v. San Isabel Elec. Ass'n*, No. 03F-282E, Decision No. C05-0180, ¶ 5, 2005 WL 433145, *1 (Colo. P.U.C. 2005) ("*Aquila II*"). In that decision, the PUC clarified that, although a utility could not service its own headquarters and warehouse buildings in another's certificated area, it "did not express nor intend that [its] findings would extend to a utility's ability to provide service to its *generation or substation facilities* located in the service territory of another utility." *Id.* (emphasis added). The PUC has not since expressed a different view on this point.

¶31 The ALJ's Recommended Decision, which the PUC adopted, examined the historical practice described above where vertically integrated utilities would net self-supplied station power against gross energy output and treat it differently from other electric services. Specifically, the ALJ considered the FERC's

19

conclusion in *PJM II* that station power is "necessary to operate the facility and enable it to generate electricity" and is thus "an internal cost of the facility." *See PJM II*, at 61,891.

¶32 The ALJ further relied on the FERC's conclusion that, because station power is an internal cost, "there is no sale (for end use or otherwise) between two different parties, but only one party using its own generating resources for the purposes of self-supply and accounting for such usage through the practice of netting." *See id.* at 61,890. In short, when a vertically integrated utility supplies its own station power, it is not causing a third party to incur the costs associated with generating such electricity and thus participates in neither a retail sale nor a wholesale sale. Instead, the vertically integrated utility itself incurs the costs through use of its own facilities.

¶33 Applying those principles here, the PUC properly concluded that no sale occurs when Black Hills self-supplies station power to its own Wind Facilities using its own transmission network and electric generation resources. Consequently, the station power needed to operate the turbines' electronics and

auxiliary equipment at the Wind Facilities does not fall within the "electric service" contemplated by San Isabel's CPCN.[4]

## 2. Self-Supply of Station Power Avoids Inefficient Duplication and Is Thus Consistent with the Doctrine of Regulated Monopoly

¶34 The ALJ concluded that "an expensive and inefficient duplication of facilities would be created if the [PUC] were to order San Isabel to provide station power" to the Wind Facilities, which "would be contrary to the Commission's duty to avoid duplication of public utility facilities and contrary to the doctrine of regulated monopoly." We agree.

¶35 "Colorado has long been dedicated to the principle of 'regulated monopoly' in the conduct of public utilities operations." *Pub. Serv. Co. v. Pub. Utils. Comm'n*, 765 P.2d 1015, 1021 (Colo. 1988). The doctrine is "designed to prevent duplication of facilities and competition between utilities, and to authorize new utilities in a field only when existing ones are found to be inadequate." *W. Colo. Power Co. v.*

---

[4] Black Hills separately argued below and in its answer brief to this court that, because state commissions have jurisdiction over retail sales and the FERC has jurisdiction over wholesale sales, *see FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 279 (2016), and because no retail sale occurred here, the Colorado PUC lacked authority to grant San Isabel the right to provide station power in its CPCN. However, Black Hills did not seek review of the PUC's conclusion that it had jurisdiction to regulate the self-supply of station power. Because this issue is not properly before us, we decline to address it.

*Pub. Utils. Comm'n*, 411 P.2d 785, 791 (Colo. 1966). Adopting the reasoning of the commissioner, this court has asked: "Why should the consuming public pay for, and maintain, two sources of power if one will do . . . ?" *Id.* Prohibiting the self-supply of station power would result in inefficient duplication and thus undermine the doctrine of regulated monopoly.

¶36 Here, the PUC approved the siting and construction of the Wind Facilities and their associated transmission lines and substations without objection from San Isabel. The interconnected lines were designed to allow the back-feed of power to the Wind Facilities without additional equipment. The PUC's approval of this arrangement was consistent with the provision in San Isabel's 1970 CPCN allowing another utility to locate substations and other needed facilities in San Isabel's certificated territory.

¶37 Black Hills argued to the ALJ that San Isabel lacks existing infrastructure to supply station power to the Wind Facilities. Though both parties agree that the ALJ did not make a factual finding on whether San Isabel has such infrastructure, San Isabel has neither pointed to any specific infrastructure that could serve the Wind Facilities nor rebutted Black Hills' assertion that San Isabel has no facilities in the relevant vicinity. Instead, San Isabel claims that it can provide electric service through unspecified, existing infrastructure or, in the alternative, construct electric infrastructure that would distribute electricity to the Wind Facilities rather

22

than transmit generated electricity from the Wind Facilities, which San Isabel contends is what the existing infrastructure does. We are not persuaded that this distinction makes new construction non-duplicative since Black Hills' Rattlesnake Butte 115-kilovolt transmission line and substation can already accommodate two-way power flows out of *and* into the Wind Facilities. Thus, the PUC's determination effectuates the doctrine's goal of avoiding inefficient duplication.

### 3. The PUC Applied Appropriate Legal Standards

¶38    We also reject San Isabel's contention that the PUC failed to comply with section 40-9.5-105(3) and this court's precedent. Section 40-9.5-105(3) allows the PUC to reduce service rights previously granted to a utility in its CPCN only when it determines, after a hearing, that the utility is unwilling or unable to serve an existing or newly developing area within its territory. Specifically, the section states that

> [w]henever the public utilities commission, after a hearing upon complaint, finds that an electric public utility, including a cooperative electric association, *is unwilling or unable to serve an existing or newly developing load within its certificated territory and that the public convenience and necessity requires a change, said commission may, in its discretion, delete from the certificate of said public utility or association that portion of said territory which the public utility or association is unwilling or unable to serve . . .* , having due regard to due process of law and to all the rights of the respective parties and to public convenience and necessity.

§ 40-9.5-105(3) (emphasis added).

23

¶39 Interpreting this language, we have held that, "[i]n a proceeding which results in the *reduction of a previously certificated area*, the requirements of due process are satisfied . . . if there is substantial evidence in the record to support a finding that the certificated public utility is unwilling or unable to serve its certificated area and that public convenience and necessity require the change." *Town of Fountain v. Pub. Utils. Comm'n*, 447 P.2d 527, 529–30 (Colo. 1968) (emphasis added).

¶40 Here, the PUC interpreted the scope of San Isabel's rights provided by the certificate's language; it did not "delet[e]" certificated territory. Where the PUC merely interprets the certificate's language but does not take away previously granted rights, this court should not interfere unless the interpretation is "clearly erroneous, arbitrary or in excess of its jurisdiction." *McKenna*, 372 P.2d at 746; *see also Grand Valley Rural Power Lines*, 447 P.2d at 28.

¶41 San Isabel relies on decisions where the PUC determined whether one utility could encroach on areas clearly certificated to another utility—not where the PUC interpreted the scope of rights provided in the certificate. *See Pub. Serv. Co.*, 765 P.2d at 1015 (using the point of use test, and not interpreting certificate language, to determine whether an electric utility could extend its existing service to a customer's physically unconnected facilities in another utility's district); *Pub. Utils. Comm'n v. Poudre Valley Rural Elec. Ass'n*, 480 P.2d 106, 108 (Colo. 1970)

24

(holding that where an area was assigned to a utility in prior litigation, the PUC could not assign service in that area to another utility based only on its ability to better service the territory); *W. Colo. Power Co. v. Pub. Utils. Comm'n*, 428 P.2d 922, 927–28 (Colo. 1967) (invalidating a PUC order to the extent that it allowed a new certificate to supersede existing ones based on the original utility having not actually provided service in the area). Such cases are inapposite here. None involved the PUC interpreting the scope of a utility's certificated rights but instead addressed PUC determinations regarding whether a utility could intrude on another's certificated area for independent reasons.

¶42 This case is also distinguishable from *Public Utilities Commission v. Colorado Motorway, Inc.*, 437 P.2d 44 (Colo. 1968), where we held that the PUC's determination was not justified by its power to interpret its own certificate. There, we clarified that "[n]o one questions [the PUC's] authority to 'interpret'" its own certificates, but the PUC did so improperly through a "general investigation held for the purpose of promulgating rules and regulations." *Id.* at 47–48. The PUC "cannot, regardless of the type of evidence that may be presented to it, revoke, amend or alter permits or certificates of participating parties" in that manner without providing adequate notice or an opportunity to be heard. *Id.* at 48. The same concerns do not exist in this case. The PUC made its interpretation during

25

an adjudication in which San Isabel was a party, filed a response, and thus had notice and an opportunity to be heard.

¶43 Interpreting the scope of San Isabel's CPCN, the ALJ made a legal determination that the self-supply of station power by Black Hills to the Wind Facilities is not subject to the exclusive service provisions of San Isabel's certificate. The ALJ did not make a finding that it was proper to *modify* portions of the certificated service territory. Accordingly, the procedure set forth in section 40-9.5-105(3) and clarified in *Town of Fountain* does not apply.

¶44 In sum, the PUC applied the appropriate standards to conclude that San Isabel has no right to provide station power to Black Hills' facilities. Because its conclusions were also based on adequate justifications, the PUC regularly pursued its authority in determining that Black Hills, as a vertically integrated utility, may self-supply station power.

### 4. Allowing Self-Supply of Station Power Promotes Colorado's Renewable Energy Policy

¶45 Though not essential to our decision, we note that permitting self-supply of station power under the circumstances of this case is also consistent with Colorado's public policy goal of promoting renewable energy. *See, e.g.*, § 40-2-124(1)(c)(I)(E), C.R.S. (2020) (requiring qualifying retail electric utilities to generate or cause to be generated thirty percent of their retail electric services from renewable energy resources); Colo. Exec. Order No. D 2017 015 (July 11, 2017)

26

(promoting Colorado's transition to cleaner energy resources). The PUC itself has acknowledged the "important public policies concerning increased use of renewable resources for the generation of electricity." *In re Tri-State Generation and Transmission Ass'n*, No. 09A-324E, Decision No. R10-1245, ¶ 550, 2010 WL 5865981 (Colo. P.U.C. 2010). More broadly, the PUC has noted that it "is in the best interests of the citizens of Colorado to develop and utilize renewable resources to the maximum practicable extent." *In the Matter of the Application of Black Hills/Colo. Elec. Util. Co., LP*, No. 13A-0445E, Decision No. C15-0373, ¶ 17, 2015 WL 1909766, *4 (Colo. P.U.C. 2015) (quoting Ch. 355, sec. 1, § 40-2-124, 2005 Colo. Sess. Laws 2323, 2336).

¶46 To construe San Isabel's CPCN to give it the exclusive right to supply Black Hills' station power would undermine this policy goal because, as the PUC noted in its brief, there is a "need for renewable energy resources to be sited wherever there is most consistent wind speed or hours of sunlight." If vertically integrated utilities need to negotiate for station power services or have certificated energy generators build new and duplicative infrastructure to accommodate such utilities whenever it is most optimal to locate wind farms or other renewable energy resources in another utility's certificated area, the additional costs and burdens will likely, as the PUC argued, "have a chilling effect on renewable resource development through the state."

## C. San Isabel Was Not Deprived of Due Process

¶47   The right to render electric service under an existing certificate is a property right that cannot be affected without due process. *City of Greeley v. Poudre Valley Rural Elec. Ass'n*, 744 P.2d 739, 745 (Colo. 1987). San Isabel asserts that the PUC deprived it of due process under both the Colorado and U.S. Constitutions by failing to provide San Isabel with a hearing and to consider whether San Isabel was unwilling or unable to serve its certificated area under section 40-9.5-105(3). But because the PUC regularly pursued its authority in concluding that San Isabel's rights to render electric service did not include the provision of station power to vertically integrated utilities in its certificated territory, San Isabel never had a property right in providing this particular service.

¶48   Without a property right, San Isabel could not have been deprived of due process under either the Colorado or the U.S. Constitution. *See Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 570–71 (1972) ("[T]o determine whether due process requirements apply in the first place, we must look . . . to see if the interest is within the Fourteenth Amendment's protection of liberty and property."); *see also* U.S. Const. amend. XIV, § 1 ("No State shall . . . deprive any person of life, liberty, or *property*, without due process of law . . . ." (emphasis added)); Colo. Const. art. II, § 25 ("No person shall be deprived of life, liberty or *property*, without due process of law." (emphasis added)).

28

## III. Conclusion

¶49    For the foregoing reasons, we hold that the PUC regularly pursued its authority and applied proper standards in determining that San Isabel has no right under its CPCN to provide station power to Black Hills' wind farms located in San Isabel's service territory. Therefore, Black Hills, as a vertically integrated utility, may continue to self-supply such power using its own interconnected transmission network and electric generation resources. We also determine that the PUC's decision did not violate San Isabel's due process rights under either the Colorado or U.S. Constitutions because it had no property right in the provision of station power. Accordingly, we affirm the judgment of the district court upholding the PUC's decision.